UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**PRIORITY SEND**

### CIVIL MINUTES -- GENERAL

Case No.   **CV 09-4609-JFW (RZx)**                    Date: June 7, 2010

Title:       U.S. Auto Parts Network, Inc. -*v*- Parts Geek, LLC, et al.

**PRESENT:**

HONORABLE JOHN F. WALTER, UNITED STATES DISTRICT JUDGE

Shannon Reilly                              None Present
Courtroom Deputy                          Court Reporter

**ATTORNEYS PRESENT FOR PLAINTIFFS:**       **ATTORNEYS PRESENT FOR DEFENDANTS:**
None                                                None

PROCEEDINGS (IN CHAMBERS):       ORDER GRANTING DEFENDANT LUCAS
                                                    THOMASON'S MOTION FOR SUMMARY JUDGMENT
                                                    [filed 4/12/10; Docket No. 154];

                                                    ORDER GRANTING PLAINTIFF AND COUNTER-
                                                    DEFENDANT U.S. AUTO PARTS NETWORK, INC.'S
                                                    MOTION FOR SUMMARY JUDGMENT [filed 4/12/10;
                                                    Docket No. 150];

                                                    ORDER GRANTING IN PART AND DENYING IN PART
                                                    THE PARTS GEEK DEFENDANTS' MOTION FOR
                                                    SUMMARY JUDGMENT ON PLAINTIFF'S COMPLAINT
                                                    [fld 4/12/10; Docket No. 144]; and

                                                    ORDER DENYING THE PARTS GEEK DEFENDANTS'
                                                    MOTION FOR LEAVE TO FILE A FIRST AMENDED
                                                    ANSWER AND COUNTERCLAIM [filed 3/29/10; Docket
                                                    No. 124]

       On March 29, 2010, Defendant and Counterclaimant Parts Geek LLC ("Parts Geek") and
Defendants Richard E. Pine, Brian Tinari, Lowell E. Mann, Todd Daugherty, Dannie Hendershot,
Cheryl M. Hendershot, and Kyle Singleton (collectively, Parts Geek, Pine, Tinari, Mann, Daugherty,
Dannie Hendershot, Cheryl M. Hendershot, and Singleton are known as the "Parts Geek

Initials of Deputy Clerk __sr__

Defendants")[1] filed a Motion for Leave to File a First Amended Answer and Counterclaim ("Motion to Amend").  On April 5, 2010, Plaintiff and Counter-Defendant U.S. Auto Parts Network, Inc. ("USAP") filed its Opposition.

On April 12, 2010, the Parts Geek Defendants filed a Motion for Summary Judgment on USAP's Complaint.  On April 19, 2010, USAP filed its Opposition.  On April 26, 2010, the Parts Geek Defendants filed a Reply.  On May 11, 2010, the Parts Geek Defendants filed a Supplemental Brief in Support of its Motion for Summary Judgment and in Opposition to USAP's Motion for Summary Judgment.

On April 12, 2010, USAP filed a Motion for Summary Judgment.  On April 19, 2010, Parts Geek filed its Opposition.  On April 26, 2010, USAP filed a Reply.  On May 11, 2010, USAP filed a Supplemental Brief in Support of its Motion for Summary Judgment and in Opposition to the Parts Geek Defendants' Motion for Summary Judgment and Defendant Thomason's Motion for Summary Judgment.

On April 12, 2010, Defendant Lucas Thomason filed a Motion for Summary Judgment.  On April 19, 2010, USAP filed its Opposition.  On April 26, 2010, Thomason filed a Reply.  On May 11, 2010, Thomason filed a Supplemental Brief in Support of his Motion for Summary Judgment and in Opposition to USAP's Motion for Summary Judgment.

Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the Court found the matters appropriate for submission on the papers without oral argument.  The matters were, therefore, removed from the Court's May 10, 2010, hearing calendar and the parties were given advance notice.  After considering the moving, opposing, and reply papers, and the arguments therein, the Court rules as follows:

## I.      Factual and Procedural Background[2]

### A.      Facts Relevant to USAP's Claims.

On June 25, 2009, USAP filed a Complaint for Injunctive Relief and Damages.  On August 5, 2009, USAP filed a First Amended Complaint for Injunctive Relief and Damages.  On January 27, 2010, USAP filed a Second Amended and Supplemental Complaint for Injunctive Relief and Damages ("Second Amended Complaint") against Defendants Parts Geek, Pine, Tinari, Mann, Daugherty, Dannie Hendershot, Cheryl M. Hendershot, Singleton, and Thomason, alleging the following claims for relief: (1) misappropriation of trade secrets under California Civil Code § 3426,

---

[1]  On April 21, 2010, the parties filed a Stipulated Voluntary Dismissal As to Individual Defendants Todd Daugherty, Cheryl M. Hendershot, and Kyle Singleton, dismissing Todd Daugherty, Cheryl M. Hendershot, and Kyle Singleton from this action with prejudice.

[2]  To the extent any of these facts are disputed, they are not material to the disposition of the motions before the Court.  In addition, to the extent that the Court has relied on evidence to which the parties have objected, the Court has considered and overruled those objections.  As to the remaining objections, the Court finds that it is unnecessary to rule on those objections because the disputed evidence was not relevant to the Court's rulings.

*et seq.*, against all the defendants; (2) breach of contract against Defendants Pine, Tinari, Daugherty, Dannie Hendershot, and Singleton; (3) unfair competition under California Business & Professions Code § 17200, *et seq.*, against all the defendants; and (4) copyright infringement against Defendants Parts Geek and Thomason.

USAP is a publicly-traded corporation, and an online provider of aftermarket auto parts, including body parts, engine parts, performance parts, and accessories.  USAP had annual sales of approximately $176 million in 2009.  USAP's online business uses a software system known as "Manager," which functions as USAP's primary "back-office" order processing component and which assists in executing key functionalities related to entity management, transaction management, services, and reporting.

Pine, Tinari, Mann, and Daugherty were the shareholders of the ThePartsbin.com, All OEM Parts, Inc., Auto Parts Web Solutions, Inc., Auto Parts Online Canada, Inc., Web Chat Solutions, Inc., Power Host, Inc., and Everything Internet, LLC (collectively, "Partsbin"), which were a collection of companies that sold aftermarket automotive parts over the internet.  In 1996, Pine and Daugherty founded BenzBin, which was an internet company selling primarily Mercedes Benz parts.  In 2000, Tinari and Mann joined BenzBin, which changed its name to Partsbin because the business had expanded beyond selling Mercedes Benz Parts.

As the internet grew, Partsbin's business grew, and it decided to acquire an e-commerce software platform for its ever expanding business.  As a result of Tinari's familiarity with Thomason and his Manager program[3] which Thomason had licensed to Tinari's company, TheSupplementBin.com[4], Partsbin contacted Thomason about acquiring a license to use the Manager program and to determine if Thomason would be interested in working for Partsbin.  In April 2001, Thomason accepted Partsbin's offer of employment, and also agreed to a non-exclusive license allowing Partsbin to use his Manager program.  Although he agreed to become an employee of Partsbin, it was also agreed that Thomason would continue to own the Manager program and any improvements to or subsequent versions of the Manager program that he might create during his employment with Partsbin.[5]

_____

[3]  Thomason created the e-commerce software platform called "Manager" (also known as "Manager 1.0") in late 1999 or early 2000, while he was self-employed and doing business as "Lucas Networks."  Thomason wrote and configured the source code that compromised the Manager program, and was the sole owner of that computer program.  Subsequent to creating the original Manager program, Thomason developed several versions of the Manager program, which were based on his original program and which became known as Manager 2.0, Manager 3.0, and Manager 4.0.  Thomason owned the copyright on the Manager program and each of its subsequent versions until he assigned those rights to Parts Geek on March 5, 2010.

[4]  After he created the Manger program, Thomason licensed it to several e-commerce companies, including TheSupplementBin.com and YankeeGiftBasket.com.

[5]  Thomason's employment with Partsbin continued until May 2006 when Partsbin and USAP entered into an Acquisition Agreement, which resulted in the merger of Partsbin and USAP, and a relocation of Partsbin's business from New Jersey to California.  Because Thomason was not an owner or shareholder of Partsbin, he was not a party to the Acquisition Agreement.  Moreover, although he gave Partsbin permission to transfer its copy of the software Manager and

Initials of Deputy Clerk _sr_

By the beginning of 2006, Partsbin's business has become extremely successful, with revenue of $37.8 million for 2005 and estimated revenue of $70.7 million for 2006.  After USAP decided to expand its business to include the online sales of automotive parts, USAP contacted the owners of Partsbin to determine if they had any interest in selling Partsbin.  After the owners of Partsbin expressed a willingness to explore the sale of the company, the parties began negotiating the terms of the sale to USAP.  USAP's investment banker, RBC Capital Markets, Inc. ("RBC") and USAP's Chief Financial Officer primarily handled the negotiations and conducted the necessary due diligence on behalf of USAP.  After USAP completed its due diligence, the parties entered into the Acquisition Agreement and a series of related agreements on May 19, 2006.  The Acquisition Agreement provided that USAP would acquire all the shares of Partsbin and certain of its affiliates in exchange for $25 million in cash; the issuance of four promissory notes to the selling shareholders Pine, Tinari, Daugherty, and Mann, payable in quarterly installments beginning June 30, 2007, and coming due in full on March 31, 2008; and the issuance of stock in USAP.  As part of the acquisition, the parties also signed the following related agreements on May 19, 2006: (1) Tinari, Pine, and Daugherty signed employment agreements with USAP[6]; (2) Mann signed a consulting agreement with USAP[7]; (3) Pine, Tinari, Daugherty, and Mann signed Non-Competition Agreements; and (4) Pine, Tinari, Daugherty, Mann, and Dannie Hendershot signed Confidential Information and Invention Assignment Agreements.

Unfortunately, a dispute arose between USAP and the selling shareholders concerning, among other things, certain post-closing adjustments that would have reduced the payments due under the promissory notes.  The parties were unable to resolve their dispute, which resulted in the decision to terminate their respective obligations under the Acquisition Agreement and to terminate the selling shareholders' employment relationships with USAP.  After several weeks of negotiations, the parties entered into settlement agreements and general releases that were signed by USAP and Pine, Tinari, Daugherty, and Mann in January 2008, but effective as of December 31, 2007.

Shortly after they severed their relationship with USAP, Mann, Pine, Tinari, and Dannie Hendershot formed Parts Geek in order to again engage in the online sales of automotive parts to consumers.[8]  After Parts Geek became operational, Mann contacted Thomason, who by this time

---

its license to use the Manager program, Thomason never agreed to transfer his ownership of the Manager program to Partsbin or USAP.

[6]  Pursuant to their respective employment agreements, Pine was hired as the Vice President of Operations for a term of two years.  Pine's employment with USAP was terminated effective August 17, 2007.  Tinari was hired as Vice President of Marketing for a term of two years.  Tinari resigned from USAP's employment on February 22, 2008.  Daugherty was hired as an Assistant Vice President of Finance for a term of six months.  Several Partsbin employees also accepted positions with USAP.  For example, Dannie Hendershot worked for USAP until he was terminated in May 2008, and Thomason worked for USAP until he resigned in July 2008.

[7]  Mann's consulting agreement was for a term of six months, but Mann states that he was never contacted or asked to perform any services for USAP during that six month period.

[8]  Singleton, Cheryl Hendershot, and Thomason are not owners of Parts Geek.

Initials of Deputy Clerk  _sr_

had resigned his employment with USAP, to discuss Parts Geek's need for a software e-commerce program.  Thomason agreed to assist Parts Geek in developing a software e-commerce program, and, in the fall of 2008, Thomason wrote what he called the "Admin" software e-commerce program and licensed it to an affiliate of Parts Geek, Web Geek, LLC, in October 2008.  The Parts Geek Defendants' formation of a competing business and the development and use of Thomason's Admin program prompted the filing of this action by USAP.

### B.    Facts Relevant to Parts Geek's Counterclaims.

On February 22, 2010, Parts Geek filed counterclaims against USAP alleging claims for antitrust violations and for tortious interference of its economic relationship with World Pac.  In its first counterclaim, Parts Geek alleges that this lawsuit is an attempt to monopolize the putative market for "internet online sales of automotive parts" in violation of Section 2 of the Sherman Act.  In its second counterclaim, Parts Geek alleges that USAP has engaged in predatory pricing in violation of Section 2 of the Sherman Act.  Parts Geek also alleges that USAP has "monopoly power" in the putative market for "internet sale of after-market automotive parts;" that USAP has sold parts purchased from one of its suppliers, World Pac, to consumers at "below cost" by offering free shipping to end consumers in an effort to eliminate Parts Geek from the marketplace.  In its third counterclaim, Parts Geek alleges that USAP has engaged in predatory pricing in violation of the Robinson-Patman Act, based on USAP's offers of free shipping to end consumers.  Parts Geek also alleges that USAP has unlawfully "crawled" Parts Geek's website to discover pricing information that enables USAP to set prices that Parts Geek cannot match.  In its fourth counterclaim, Parts Geek alleges that USAP has tortiously interfered with Parts Geek's economic relationship with World Pac by suggesting that World Pac should cease doing business with Parts Geek.

World Pac is a major supplier of automotive parts to USAP.  USAP offers free shipping to end users who place orders for World Pac parts that total $50 or more.  World Pac orders totaling less than $50 are assessed a flat $5.50 shipping and handling charge.  USAP has presented evidence that, because of a programming error, it did provide free shipping for a limited number of World Pac orders under $50; however, USAP corrected the error immediately after it was discovered.  According to USAP's evidence, the free shipping error affected no more than three of its websites, and those sites are relatively "low traffic" websites, with a combined total revenue representing approximately three percent of USAP's total online sales during the period from January 1, 2009, through March 31, 2010.  In addition, the error involved only 1,917 units sold, with an aggregate order price of $27,909, which represents less than one-tenth of one percent of USAP's total World Pac sales during that same time frame.

Although USAP admits that it routinely monitors prices charged by its competitors, it denies using crawling software.  Instead, USAP monitors competitors' prices by using a team of employees who manually research competitors' publicly available websites to determine what prices its competitors, including Parts Geek, are charging for similar automotive parts sold by USAP.

## II.    Legal Standard

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party has the burden of demonstrating the absence of a genuine issue of fact for trial.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  A party opposing a properly made and supported motion for summary judgment may not rest upon mere denials but must "set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e); *see also Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) ("A summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data.").  In particular, when the non-moving party bears the burden of proving an element essential to its case, that party must make a showing sufficient to establish a genuine issue of material fact with respect to the existence of that element or be subject to summary judgment.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "An issue of fact is not enough to defeat summary judgment; there must be a genuine issue of material fact, a dispute capable of affecting the outcome of the case."  *American International Group, Inc. v. American International Bank*, 926 F.2d 829, 833 (9th Cir. 1991) (Kozinski, dissenting).

An issue is genuine if evidence is produced that would allow a rational trier of fact to reach a verdict in favor of the non-moving party.  *Anderson*, 477 U.S. at 248.  "This requires evidence, not speculation."  *Meade v. Cedarapids, Inc.*, 164 F.3d 1218, 1225 (9th Cir. 1999).  The Court must assume the truth of direct evidence set forth by the opposing party.  *See Hanon v. Dataproducts Corp.*, 976 F.2d 497, 507 (9th Cir. 1992).  However, where circumstantial evidence is presented, the Court may consider the plausibility and reasonableness of inferences arising therefrom.  *See Anderson*, 477 U.S. at 249-50; *TW Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 631-32 (9th Cir. 1987).  Although the party opposing summary judgment is entitled to the benefit of all reasonable inferences, "inferences cannot be drawn from thin air; they must be based on evidence which, if believed, would be sufficient to support a judgment for the nonmoving party."  *American International Group*, 926 F.2d at 836-37.  In that regard, "a mere 'scintilla' of evidence will not be sufficient to defeat a properly supported motion for summary judgment; rather, the nonmoving party must introduce some 'significant probative evidence tending to support the complaint.'"  *Summers v. Teichert & Son, Inc.*, 127 F.3d 1150, 1152 (9th Cir. 1997).

## III.    Discussion

### A.    USAP's Rule 56(f) Request is Denied.

In its Opposition to Thomason's Motion for Summary Judgment, USAP requests a continuance pursuant to Federal Rule of Civil Procedure 56(f) for the purpose of conducting additional discovery.  "A party against whom relief is sought may move at any time, with or without supporting affidavits, for summary judgment on all or part of the claim."  Fed. R. Civ. P. 56(b).  However, "[i]f a party opposing the motion ***shows by affidavit*** that, for specified reasons, it cannot present facts essential to justify its opposition, the court may . . . deny the motion; [ ] order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken; [or] issue any other just order."  Fed. R. Civ. P. 56(f) (emphasis added).

A party invoking Rule 56(f) "bears the burden of showing 'what facts [it] hopes to discover to raise a material issue of fact.'"  *Terrell v. Brewer*, 935 F.2d 1015, 1018 (9th Cir. 1991) (quoting *Hancock v. Montgomery Ward Long Term Disability Trust*, 787 F.2d 1302, 1306, n.1 (9th Cir. 1986)).  "Compliance with Rule 56(f) requires more than a perfunctory assertion that the party cannot respond because it needs to conduct discovery.  In that regard, references in memoranda and declarations positing a need for discovery do not constitute a proper motion under Rule 56(f).

Rather, that rule requires affidavits setting forth with particularity: (1) why the party opposing summary judgment cannot respond; (2) the particular facts that the party reasonably expects to obtain in further discovery; and (3) how the information reasonably expected from its proposed discovery requests could be expected to create a genuine issue of material fact that would defeat the summary judgment motion." *Adams v. Allstate Insurance Co.*, 187 F. Supp. 2d 1207, 1213 (C.D. Cal. 2002); *see also Tatum v. City and County of San Francisco*, 441 F.3d 1090, 1100 (9th Cir. 2006) ("A party requesting a continuance pursuant to Rule 56(f) must identify by affidavit the specific facts that further discovery would reveal, and explain why those facts would preclude summary judgment."). "The party seeking additional discovery also bears the burden of showing that the evidence sought exists." *Terrell*, 935 F.2d at 1018. "Failure to comply with the requirements of Rule 56(f) is a proper ground for denying discovery and proceeding to summary judgment." *Brae Transportation, Inc. v. Coopers & Lybrand*, 790 F.2d 1439, 1443 (9th Cir. 1986).

Moreover, even where these prerequisites are met, a court may refuse to continue hearing a summary judgment motion where a party has had the opportunity to conduct discovery in a diligent fashion, but failed to do so." *Adams*, 187 F. Supp. 2d at 1213 citing *Stitt v. Williams*, 919 F.2d 516, 526 (9th Cir. 1990).

In this case, USAP argues in its Rule 56(f) request that Thomason's Motion for Summary Judgment should be denied or continued because Thomason had not yet been deposed and USAP was only provided with Thomason's versions of the Manager program on April 1, 2010. However, USAP had the opportunity to, and did in fact, take the deposition of Thomason on April 23, 2010. Thereafter, the Court permitted and all parties did file supplemental briefs addressing the testimony of Thomason that they believed supported their respective positions. *See*, May 6, 2010 Order and the parties' Supplemental Briefs (Docket Nos. 243, 246, and 248). In addition, USAP's claim of delayed discovery involving Thomason – both his deposition and documents – was primarily due to USAP's own tactics and decisions in prosecuting this case. For example, although USAP served a third party deposition subpoena on Thomason before he was added as a party, USAP agreed to "withdraw the subpoenas served on Mr. Thomason provided he makes himself available for deposition on May 3, 2010, regardless of whether any motion that you may file to postpone trial, to postpone discovery deadlines, or anything else is granted, denied, or still pending by May 3rd." In addition, on March 17, 2010, in its opposition to Thomason's application to continue the trial date and related deadlines, USAP objected and argued that "there is still time for Thomason to prepare his defense, and a postponement of the Court's schedule is neither necessary nor appropriate." Therefore, USAP cannot now gain an advantage from its own delay and pre-trial tactics by requesting Thomason's Motion for Summary Judgment be denied or delayed pursuant to Rule 56(f). *See, e.g., Landmark Development Corp. v. Chambers Corp.*, 752 F.2d 369, 372 (9th Cir. 1985) (Rule 56(f) request properly denied when "failure to take further depositions apparently resulted largely from plaintiff's own delay."); *Stephens v. Liberty Mutual*, 2008 WL 480287, * 22 (N.D. Cal. Feb. 19, 2008) ("The fact that plaintiff failed to complete its discovery by the dispositive-motions filing date provides no justification for the court to decline to rule on the present [summary judgment] motions.").

Accordingly, USAP's Rule 56(f) request is **DENIED**.

**B.    USAP's Second Amended Complaint.**

      **1.    USAP's Copyright Claims Against Parts Geek and Thomason.**

Initials of Deputy Clerk __sr__

To prove copyright infringement, USAP must prove: (1) ownership of a valid copyright, and (2) that the defendants copied elements of the work protected by that copyright.  *See, e.g., Pasillas v. McDonald's Corp.*, 927 F.2d 440, 442 (9th Cir. 1991); *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 481 (9th Cir. 2000).  Because direct evidence of copying is rarely available and copying can therefore be difficult to prove, USAP "may establish copying by showing (1) circumstantial evidence of access to the protected work and (2) substantial similarity of 'ideas' and 'expression' between the copyrighted work and the allegedly infringing work."  *Jason v. Fonda*, 526 F. Supp. 774, 776 (C.D. Cal. 1981), *aff'd*, 698 F.2d 966 (9th Cir. 1982); *see, also, Three Boys Music*, 212 F.3d at 481 ("Absent direct evidence of copying, proof of infringement involves fact-based showings that the defendant had 'access' to the plaintiff's work and that the two works are 'substantially similar.'").

### a.      USAP's Copyright Claim with Respect to the Manager Program.

In this case, USAP cannot demonstrate that it owns the Manager program because the evidence is undisputed that Thomason was the exclusive owner of all rights related to the Manager program and all subsequent versions of the Manager program until he assigned those rights to Parts Geek on March 5, 2010.  Although USAP argues otherwise, the evidence presented by Thomason and the Parts Geek Defendants – the only parties involved in the creation of the Manager program and the only parties with personal knowledge of the facts relating to Thomason's agreement to grant a non-exclusive license to Partsbin – is undisputed, clear, and has remained consistent: Thomason built an e-commerce software platform called Manager in late 1999 or early 2000 when he was self-employed, and while he provided non-exclusive licenses for the use of the Manager program to several e-commerce companies, including Partsbin and USAP, he at no time transferred or assigned any of his ownership rights in the Manager program to Partsbin, anyone associated with Partsbin, USAP, or anyone associated with USAP.

USAP's main argument in support of its claim that it owns the copyright to the Manager program is based on its interpretation of various sections of the Acquisition Agreement, which USAP contends demonstrates that Partsbin was the sole and exclusive owner of the Manager program and that Partsbin transferred all of its rights, title, and interest in the Manager program to USAP.[9]  However, as the Parts Geek Defendants correctly point out, Schedule 4.19(a) of the Acquisition Agreement merely states that "manager" is "owned by the Company."  The Court agrees with the Parts Geek Defendants and concludes that Schedule 4.19(a) simply refers to Partsbin's ownership of a copy of the Manager program and the non-exclusive license that Partsbin had to use the program in its business.  The law is clear that there is a meaningful and important distinction between ownership of a copy of a software program such as Manager and the ownership of a copyright or any of the exclusive rights under a copyright.  Specifically, 17 U.S.C. § 202 provides:

Ownership of a copyright, or of any of the exclusive rights under a copyright, is distinct from ownership of any material object in which the work is embodied.

---

[9]  In reliance on its interpretation of the Acquisition Agreement, USAP apparently obtained copyrights on "Manager July 2008" (Registration Number TX 6-977-637, effective September 28, 2009), "Manager 2005" (Registration Number TXu 1-616-423, effective September 28, 2009), and "Versapart" (Registration Number TXu 1-615-799, effective September 24, 2009).

Initials of Deputy Clerk _sr_

Transfer of ownership of any material object, including the copy or phonorecord in which the work is first fixed, does not of itself convey any rights in the copyrighted work embodied in the object; nor, in the absence of an agreement, does transfer of ownership of a copyright or of any exclusive rights under a copyright convey property rights in any material object.

*See,* 17 U.S.C. § 202; *see, also,* 17 U.S.C. § 117 (enumerating rights that are included with ownership of a copy of a computer program, including such valuable rights as the ability to make additional copies under certain circumstances, and the ability to lease, sell, or transfer those copies along with the lease, sale, or transfer of all rights in the program).[10]

Even assuming *arguendo* that the Parts Geek Defendants misrepresented that they owned the rights to the Manager program, USAP would still not be the owner of the Manager copyright because Thomason was the sole owner of the rights to the Manager program at the time of the Acquisition Agreement.  Thomason was not a party to that agreement or any other agreement transferring his rights.  Without Thomason's agreement, Partsbin simply could not transfer and USAP could not acquire any ownership rights in Thomason's Manager program.  Accordingly, in the absence of Thomason's agreement, USAP cannot prove that it owns the Manager program (or any of its subsequent versions).  As the Ninth Circuit has found, "[t]he rule is really quite simple: If the copyright holder agrees to transfer ownership to another party, that party must get the copyright holder to sign a piece of paper saying so."  *Effects Assocs., Inc. v. Cohen,* 908 F.2d 555, 557 (9th Cir. 1990).  In this case, Thomason never agreed to transfer his ownership of the Manager program (or any of its subsequent versions) to either Partsbin or USAP, and he certainly did not do so in writing as is required by the Copyright Act.  As a result, Partsbin could only transfer what it owned – a copy of the Manager program and a non-exclusive license to use it – to USAP in the Acquisition Agreement.[11]

Moreover, despite USAP's argument's to the contrary, USAP understood that Thomason owned the Manager program and all of its subsequent versions.[12]  For example, the Chief Information Officer of USAP acknowledged that Thomason was "the system owner for the Manager platform."  In addition, in 2008, after approximately 18 months of employment, USAP asked Thomason to sign a Confidentiality and Non-Disclosure Agreement and a Confidential Information and Invention Assignment Agreement, which would have required the transfer of all of

---

[10]  The Parts Geek Defendants also present evidence – largely undisputed by USAP – that prior to the acquisition, RBC, USAP's investment banker who was responsible for due diligence for the acquisition, was advised that Thomason owned the Manager program, and that although Partsbin owned a copy of the software and had a non-exclusive license to use the program, it did not own any other rights to the Manager program.  However, in light of the Court's interpretation of the Acquisition Agreement, it is not necessary to consider the Parts Geek Defendant's evidence.

[11]  If USAP believed that Partsbin misrepresented the nature of the intellectual property it was transferring to USAP in the Acquisition Agreement, USAP could have included a claim for fraud, or, at a minimum, breach of the Acquisition Agreement.

[12]  Although USAP was aware of Thomason, there is no evidence that USAP made any effort to contact Thomason to clarify any issues related to the Manager program prior to the execution of the Acquisition Agreement.

Initials of Deputy Clerk __sr__

Thomason's intellectual property rights to USAP, including those versions of the Manager program
that he had developed prior to his employment with USAP.  Specifically, the Confidential
Information and Invention Assignment Agreement provided in pertinent part:

> In the event that the Subject Ideas and Inventions [which is defined to include,
> among other items, "inventions," "technologies," "computer hardware or software,"
> "original works of authorship," "copyrights," "copyrightable works," "and all
> improvements, know-how, data, rights, and claims related to the foregoing"] shall be
> deemed not to constitute works made for hire, or in the event that I should otherwise,
> by operation of law, be deemed to retain any rights . . . to any Subject Ideas and
> Inventions, I agree to assign to [USAP], without further consideration, my entire right,
> title, and interest in and to each and every such subject Idea and Invention.

Thomason refused to sign either agreement and instead resigned.  Shortly thereafter, USAP,
without Thomason's consent, registered copyrights in Manager 2005, Manager July 2008, and
Versapart.

        In an effort to save its copyright claim, USAP argues that Manager 2005, Manager July
2008, and Versapart are not derivative works of the initial Manager program.  However, USAP's
argument is unpersuasive.  As the creator and owner of all rights in the Manager program,
Thomason also owned all rights in any derivative works.  17 U.S.C. § 106(2) (one of the rights of a
copyright holder is "to prepare derivative works based upon the copyrighted work").  Thomason
created Manager 2005 when he was employed by Partsbin, and it is undisputed that Thomason
and the Parts Geek Defendants agreed that Manager 2005 was a derivative work based on the
original Manager program.  In addition, USAP's Chief Technology Officer has confirmed that
Manager July 2008 and Versapart were based on the original Manager program.  Thus, even if
Thomason created Manager 2005, Manager July 2008, and Versapart while he was employed by
either Partsbin or USAP, they were still, first and foremost, derivative works based on his original
Manager program, and there is no evidence that Thomason transferred or otherwise relinquished
his rights to create such derivative works.  Therefore, because USAP has failed to demonstrate
that Manager 2005, Manager July 2008, and Versapart are not derivative works based on the
original Manager program or that Thomason transferred or relinquished his right to create
derivative works, USAP has failed to demonstrate ownership of a valid copyright, and its copyright
claim must fail.  *See, e.g., Gilpin v. Siebert*, 419 F.Supp. 2d 1288, 1294 (D. Or. 2006) ("To show
ownership of a valid copyright, a plaintiff bears the burden of proving that the work as a whole is
original.").

        For the foregoing reasons, the Court concludes that Thomason was the original creator and
owner of the copyright in the Manager program and the subsequent versions of the Manager
program created by Thomason as derivative works, until he assigned those rights to Parts Geek on
March 5, 2010.  Accordingly, the Parts Geek Defendants' Motion for Summary Judgment on
USAP's fourth claim for relief for copyright infringement related to the Manager program is
**GRANTED**, and Thomason's Motion for Summary Judgment on USAP's fourth claim for relief for
copyright infringement related to the Manager program is **GRANTED**.

      **b.**    **USAP's Copyright Claim with Respect to the Photograph of Auto
            Parts.**

Initials of Deputy Clerk _sr_

Having reviewed the evidence and arguments of the parties, the Court finds that there are genuine issues of material fact which preclude the Court from granting summary judgment in favor of the Parts Geek Defendants on USAP's claim for copyright infringement related to the photograph of auto parts.[13]  In addition, although the Parts Geek Defendants argue that they did not willfully infringe USAP's copyrighted photograph[14] – they contend that they ceased using the photograph as soon as they learned of USAP's claim that the photograph was copyrighted – and that they did not reap any profits from their use of the photograph, these arguments are relevant to damages, and not liability.  *See, e.g., Pye v. Mitchell*, 574 F.2d 476, 481 (9th Cir. 1978) ("[E]ven where the defendant believes in good faith that he is not infringing a copyright, he may be found liable.").  Accordingly, the Parts Geek Defendants' Motion for Summary Judgment on USAP's fourth claim for relief for copyright infringement related to the photograph of auto parts is **DENIED**.

## 2.   USAP's Trade Secret Claims Against All Defendants.

Under the California Uniform Trade Secret Act, a *prima facie* claim for misappropriation of trade secrets requires USAP to demonstrate that: (1) USAP owned a trade secret; (2) the defendants acquired, disclosed, or used USAP's trade secret through improper means; and (3) the defendants' actions damaged USAP.  *Sargent Fletcher, Inc. v. Able Corp.*, 110 Cal. App. 4th 1658, 1665 (2003).  The California Uniform Trade Secret Act defines a trade secret as information that:

(1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and

(2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Cal. Civ. Code § 3426.1(d).  The California Uniform Trade Secret Act defines "improper means" as including "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means."  Cal. Civ. Code § 3426.1(a).  In addition, each alleged trade secret must be described "with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons . . . skilled in the trade."  *Universal Analytics v. MacNeil-Schwendler Corp.*, 707 F. Supp. 1170, 1177 (C.D. Cal. 1989), *aff'd*, 914 F.2d 1256 (9th Cir. 1990) (internal citation omitted).

In this case, all of the defendants are entitled to summary judgment with respect to USAP's misappropriation of trade secret claim related to the Manager program and its subsequent versions because, as discussed above, USAP does not own the rights to the Manager program or its subsequent versions, and, therefore, cannot demonstrate a *prima facie* claim for misappropriation of trade secrets.

---

[13]  This portion of USAP's copyright infringement claim is alleged against the Parts Geek Defendants only.  *See,* USAP's Opposition to Thomason's Motion for Summary Judgement, generally.

[14]  USAP has obtained a copyright in its marketing art, including "Parts Street Collage" (Registration Number VA 1-673-974, effective July 7, 2009).

Initials of Deputy Clerk  _sr_

In addition, summary judgment is appropriate with respect to USAP's misappropriation of trade secret claim related to its keyword return-on-investment data.[15]  USAP's claim is based on e-mails Tinari sent to his personal Yahoo! e-mail account and to Pine in December 2007 (after Pine had ended his employment with USAP), and another e-mail Tinari sent to his personal Yahoo! e-mail account in January 2008.  These e-mails included Excel spreadsheets as attachments, which contained 800 and 6500 keywords, respectively, that were purportedly among the keywords used by USAP in 2007.  In addition, the spreadsheets contained information about each keyword's return-on-investment, which includes an analysis of each words relative effectiveness and profitability over time.

In a trade-secret case, "a plaintiff must prove that the defendant has used the plaintiff's secret to the plaintiff's detriment."  *Droeger v. Welsh Sporting Goods Corp.*, 541 F.2d 790, 792 (9th Cir. 1976) (holding that disclosure of the secret to the defendant, followed by manufacture of a closely similar device by the defendant, shifts to the defendant the burden of going forward with evidence to prove, if it can, that it arrived at the process through independent invention").  In this case, USAP's Vice President of Marketing, Houman Akhavan, states, in conclusory fashion, that in March and April of 2009, Parts Geek, as a new entrant into the market, began "appear[ing] in proximity to so many of USAP's best-performing keywords."  However, neither USAP nor Mr. Akhavan provide any further details or evidence to explain this conclusion, such as which keywords, how many keywords, or what type of keywords (*e.g.,* "short tail" keywords or more specific "long tail" keywords) appeared in proximity to USAP's keywords, or the identity of the search engines on which Mr. Akhavan observed this proximity, and whether this occurred on sponsored links or non-sponsored search results.  As a result, USAP has failed to offer any admissible evidence demonstrating that the Parts Geek Defendants ever used any of USAP's keyword return-on-investment data to USAP's detriment.

Accordingly, Thomason's Motion for Summary Judgment is **GRANTED** with respect to USAP's first claim for relief for misappropriation of trade secrets.  In addition, the Parts Geek Defendants' Motion for Summary Judgment is **GRANTED** with respect to USAP's first claim for relief for misappropriation of trade secrets.

### 3.      USAP's Section 17200 Claim Against All Defendants.

It is undisputed that USAP's claim for unfair competition under California Business & Professions Code § 17200, *et seq.*, against all the defendants is based on the same conduct as its claim under the California Uniform Trade Secrets Act.  Therefore, the claim is preempted by the California Uniform Trade Secrets Act.  *See, K.C. Multimedia, Inc. v. Bank of America Technology & Operations, Inc.*, 171 Cal. App. 4th 939, 961 (2009) (holding that a claim under California's Trade Secret Act preempts a claim for unfair competition based upon the same conduct); *see, also, Digital Envoy, Inc. v. Google, Inc.*, 370 F. Supp. 2d 1025, 1033-35 (N.D. Cal. 2005) ("California's statute, as persuasively interpreted in *Callaway*, preempts Digital's claims for unfair competition and unjust enrichment since those claims are based on the same nucleus of facts as the misappropriation of trade secrets claim for relief).  In fact, USAP concedes that its Section 17200

---

[15]  This portion of USAP's misappropriation of trade secret is alleged against the Parts Geek Defendants only.  *See,* USAP's Opposition to Thomason's Motion for Summary Judgement, generally.

Initials of Deputy Clerk   sr

claim is preempted and states in its Opposition that it "does not oppose Defendants' motion for
summary judgment on the Section 17200 claim." Opposition, 16:10-11. Accordingly, the Parts
Geek's Motion for Summary Judgment is **GRANTED** with respect to USAP's third claim for relief
for unfair competition under California Business & Professions Code § 17200, *et seq.* In addition,
Thomason's Motion for Summary Judgment is **GRANTED** with respect to USAP's third claim for
relief for unfair competition under California Business & Professions Code § 17200, *et seq.*

### 4.  USAP's Breach of Contract Claim Against Pine, Tinari, and Dannie Hendershot.[16]

USAP's breach of contract claim alleges that Pine, Tinari, and Dannie Hendershot breached
their individual Confidential Information and Invention Assignment Agreements. Specifically, USAP
alleges that Pine, Tinari, and Dannie Hendershot breached paragraph 1(c) of the Confidential
Information and Invention Assignment Agreement by using or disclosing USAP's trade secrets,
including the Manager program and USAP's keyword return-on-investment data. Paragraph 1(c)
provides:

> Protection of Confidential Information. I will not, directly or indirectly, use, make
> available, sell, disclose, or otherwise communicate to any person, entity or third
> party, other than in my assigned duties and for the benefit of the Company, any of
> the Company's Confidential Information, either during or after my employment with
> the Company, unless I am expressly authorized to do so in writing by the President of
> the Company. I acknowledge that I am aware that the unauthorized disclosure of
> Confidential Information of the Company may be highly prejudicial to its interests and
> an improper disclosure of trade secrets.

In addition, USAP alleges that Pine, Tinari, and Dannie Hendershot breached paragraph
3(c) of the Confidential Information and Invention Assignment Agreement by using or disclosing
USAP's trade secrets, including the Manager program and USAP's keyword return-on-investment
data. Paragraph 3(c) provides:

> Prohibited Unfair Competition. I agree that during my employment and at all times
> following the termination of my employment relationship with the Company for any
> reason, whether with or without cause, I shall not, either directly or indirectly, engage
> in any unlawful competitive activities or unfair competition against the Company or
> use confidential trade secret information to unlawfully solicit clients or customers of
> the Company.

Tinari and Pine admit that on May 19, 2006, they each executed a Confidential Information
and Invention Assignment Agreement with USAP, but they move for summary judgment because
their obligations under their respective Confidential Information and Invention Assignment
Agreements were terminated pursuant to the terms of the Settlement Agreement and General
Release, effective December 31, 2007, signed by Tinari and the Separation Agreement and
Release of All Claims, effective December 31, 2007, signed by Pine ("Release Agreements").

---

[16] USAP's breach of contract claim was also brought against Daugherty and Singleton, but,
as discussed above, these defendants have been dismissed from this action.

Initials of Deputy Clerk _sr_

Specifically, Tinari and Pine rely on the provisions of each Release Agreement that provides for termination of all obligations "arising out of or related to (i) the acquisition of Partsbin, and (ii) the Acquisition Agreement, the Escrow Agreement, Seller's Note, and any other agreement entered into between the Company and Seller in connection with the acquisition of Partsbin." *See,* Paragraph 4(b) of the Pine Release Agreement, and Paragraph 2(b) of the Tinari Release Agreement.

USAP contends that the Confidential Information and Invention Assignment Agreements were not executed "in connection with the acquisition of Partsbin," but were simply standard agreements that USAP requires many of its employees to execute.  USAP also argues that because the Release Agreements  – specifically paragraph 2(f) of Tinari's agreement and paragraph 4(g) of Pine's agreement – state that "[t]he confidentiality obligations contained in this paragraph shall be in addition to any other confidentiality agreements between the parties hereto," it is clear that the pre-existing Confidential Information and Invention Assignment Agreements survived the execution of the Release Agreements.

The Court concludes that the Confidential Information and Invention Assignment Agreements were executed in connection with the acquisition of Partsbin, and, thus, the Release Agreements terminated or released Pine and Tinari from any obligations contained in the Confidential Information and Invention Assignment Agreements.  The Confidential Information and Invention Assignment Agreements were signed on May 19, 2006, together with the Acquisition Agreement, and a variety of other agreements related to the acquisition of Partsbin by USAP, including an Escrow Agreement; a Seller's Note; employment agreements signed by Tinari, Pine, and Daugherty; a consulting agreement signed by Mann; and Non-Competition Agreements signed by Pine, Tinari, Daugherty, and Mann.  These agreements were all part of and integral to USAP's acquisition of Partsbin, including USAP's employment of Partsbin's former owners and employees, and, thus, it would be inconsistent to treat Pine and Tinari's Confidential Information and Invention Assignment Agreements as somehow separate from the other agreements that were intended to document all aspects of the transfer of Partsbin's business into USAP.

Finally, even if Pine and Tinari's Confidential Information and Invention Assignment Agreements were not terminated by their respective Release Agreements, USAP's breach of contract claim still fails because USAP has failed to demonstrate that they were breached by Pine and Tinari.  As discussed above, USAP has failed to demonstrate that it owns the Manager program, or that any of the defendants used its keyword return-on-investment data.[17]  Therefore, for that independent reason, Pine and Tinari are entitled to summary judgment on USAP's breach of contract claim.

---

[17]  Dannie Hendershot, who moves for summary judgment on the basis that he did not have access to any confidential information, is also entitled to summary judgment.  In opposing his motion, USAP merely cites to the Parts Geek Defendants' Answer, in which they admit that they were "familiar with the operation of Manager and the alleged confidential Keyword ROI Data," which is clearly insufficient to demonstrate that he had access to any confidential information and defeat summary judgment.  In addition, Dannie Hendershot is also entitled to summary judgment for the reasons stated by the Court in its ruling in favor of the Parts Geek Defendants with respect to the Manager program and the keyword return-on-investment data.

Initials of Deputy Clerk _sr_

Accordingly, the Parts Geek Defendants' Motion for Summary Judgment is **GRANTED** as to USAP's second claim for relief for breach of contract with respect to Pine, Tinari, and Dannie Hendershot.

### C.     Parts Geek's Counterclaim.

#### 1.     Parts Geek's Antitrust Counterclaims.

Parts Geek alleges two claims under Section 2 of the Sherman Act, attempted monopolization and predatory pricing.  Parts Geek also alleges a claim for price discrimination under the Robinson-Patman Act, which makes it unlawful to discriminate in price where the effect of such discrimination may be to substantially lessen competition.

##### a.     Standard for Antitrust Claims.

To state a claim for attempted monopolization, a plaintiff must allege three elements: "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power."  *Spectrum Sports v. McQuillan*, 506 U.S. 447, 456 (1993).  In determining whether there is a dangerous probability of monopolization, "courts have found it necessary to consider the relevant market and the defendant's ability to lessen or destroy competition in that market."  *Id.*  Thus, a plaintiff cannot state a claim for either monopolization or attempted monopolization without alleging a legally sufficient relevant market.

The "relevant market" inquiry is comprised of two components: (1) the relevant geographic market, and (2) the relevant product market.  *Brown Shoe Co. v. United States*, 370 U.S. 294, 336 (1962).  The scope of the relevant product market depends on two factors: (1) the extent to which the defendant's product is "interchangeable in use" with alleged alternative products, and (2) the degree of "cross-elasticity of demand" between the defendant's product and supposed substitutes for it.  *Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451 (1992); *Brown Shoe Co.*, 370 U.S. at 325.  "In case of a product, it may be of such a character that substitute products must also be considered, as customers may turn to them if there is a slight increase in the price of the main product."  *U.S. v. Grinnell*, 384 U.S. 563, 571 (1966).

After the relevant market has been defined, a plaintiff in a Section 2 attempted monopolization case must prove that the defendant has a dangerous probability of achieving monopoly, or market, power, which requires analysis of both: (1) the share of the relevant market owned by the defendant; and (2) the existence of any real barriers to entry into the marketplace.  *Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995).

Moreover, even a significant market share is not enough to "establish market power sufficient to carry out a predatory scheme."  *Rebel Oil Co.*, 51 F.3d at 1439.  Instead, the "existence of any real barriers to entry into the marketplace" prong requires the plaintiff to prove both the existence of "significant" market barriers to entry and that current competitors lack the ability to expand their output to challenge a monopolist's higher prices.  *Id.*  Entry barriers include "additional long-run costs that were not incurred by incumbent firms but must be incurred by new entrants, or factors in the market that deter entry while permitting incumbent firms to earn monopoly returns."  *Id.* (internal citations omitted).

Initials of Deputy Clerk   sr

In addition, the Supreme Court has held that a claim for primary-line price discrimination[18]
under the Robinson-Patman Act is analytically similar to a claim under Section 2 of the Sherman
Act.  *See, e.g., Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 221
(1993) ("[P]rimary-line competitive injury under Robinson-Patman Act is of the same general
character as the injury inflicted by predatory pricing schemes actionable under § 2 of the Sherman
Act.").  While the Sherman Act requires proof of a "dangerous probability" of substantial injury to
competition, the Robinson-Patman Act imposes a lesser standard of "a reasonable possibility" of
substantial injury to competition.  *Id.* at 222.  However, the threshold requirements are the same:

> [W]hatever additional flexibility the Robinson-Patman standard may imply, the
> essence of the claim under either statute is the same: A business rival has priced its
> products in an unfair manner with an object to eliminate or retard competition and
> thereby gain and exercise control over prices in the relevant market.
>
> Accordingly, whether the claim alleges predatory pricing under § 2 of the Sherman
> Act or primary-line price discrimination under the Robinson-Patman Act, two
> prerequisites to recover remain the same.  First, a plaintiff seeking to establish
> competitive injury resulting from a rival's low prices must prove that the prices
> complained of are below an appropriate measure of its rival's costs.  . . .  The
> second prerequisite to holding a competitor liable under the antitrust laws for
> charging low prices is a demonstration that the competitor had a reasonable
> prospect, or, under § 2 of the Sherman Act, a dangerous probability, of recouping its
> investment in below-cost prices.

*Id.* at 222-24 (internal citations and quotations omitted).  The "proof of a danger of recoupment"
prong "requires an estimate of the cost of the alleged predation and a close analysis of both the
scheme alleged by the plaintiff and the structure and conditions of the relevant market."  *Id.* at 226.

Therefore, to prevail on any of its antitrust claims, Parts Geek must first define the relevant
market, which involves a complex analysis of both the product market and the geographic market.
*See, e.g., Thurman Industries, Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1374 ("[A] product
market is typically defined to include the pool of goods or services that qualify as economic
substitutes because they enjoy reasonable interchangeability of use and cross-elasticity of
demand.")[19]; *Transamerica Computer Co. v. IBM Corp.*, 481 F. Supp. 965, 975 (N.D. Cal. 1979) ("if
small changes in the price of a product in one location will cause customers to turn to alternatives
available in another location, then the quantity of reasonably alternative products supplied at both
locations should be considered as part of the relevant market.").

---

[18]  Primary-line price discriminations occurs where a seller charges predatory, below-cost
prices in one geographical market to eliminate competitors there, but charges supracompetitive
prices in another market.  *Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 146 F.3d 1088, 1092 (9th
Cir. 1998).

[19]  The Supreme Court has defined cross-elasticity of demand as "the extent to which
consumers will change their consumption of one product in response to a price change in another
[product]."  *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 469 (1992).

Initials of Deputy Clerk _sr_

**b.      Application of Standard to Parts Geek's Counterclaims.**

In this case, Parts Geek fails to offer the expert testimony necessary to undertake the complex and technical analysis required to define the relevant market, and, instead relies on the testimony of Mann and Tinari.  *See, e.g., Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*, 924 F.2d 1484, 1490 (9th Cir. 1991) (affirming summary judgment where market definition was based on plaintiffs' assertions, finding "no evidence that those two principals were experts qualified to opine on a highly technical economic question"); *Independent Ink, Inc. v. Trident, Inc.*, 210 F. Supp. 2d 1155, 1170 ("Construction of a relevant economic market or a showing of monopoly power in that market cannot . . . be based upon lay opinion testimony.") (internal quotation omitted), *rev'd in part on other grounds, Independent Ink, Inc. v. Illinois Tool Works, Inc.*, 396 F.3d 1342 (Fed. Cri. 2005); *Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 782-84 (5th 1999) (court disregarded evidence that defendants' officers, employees, customers, and internal documents defined market a certain way, focusing instead on "market realities").

Here, reliance on the testimony of Tinari and Mann is insufficient because there has been no showing that either Tinari or Mann is qualified to offer an opinion, either lay or expert, as to the definition of the relevant market.  For example, while Mann states that he is "familiar with the concepts of market definition and market power" and "was trained on these concepts by the Internal Revenue Service," he does not describe the circumstances, length, or nature of his training.  Thus, Parts Geek has failed to offer any admissible evidence defining the relevant market.

In addition, even if the Court considers the testimony offered by Mann and Tinari, it fails to adequately define the relevant market.  For example, Parts Geek limits the relevant market to the United States market for online retail sales of aftermarket auto parts because "brick and mortar" stores tend to have different business models and attract different types of customers.  Parts Geek admits that the major brick and mortar retailers also have online sales, but it fails to analyze the extent to which those retailers could expand their online business and capture additional sales if the online-only sellers raised prices to supracompetitive levels.  However, the examination of this cross-elasticity of demand is an essential element of the relevant market analysis.  *Independent Ink*, 210 F.Supp. 2d at 1170 ("For antitrust purposes . . . the relevant market is determined by reasonable interchangeability, as evidenced by cross-elasticity of demand and supply, not by laymen's comments made in a competitive business environment.") (internal quotation omitted). Moreover, Mann speculates that the total market for online sales of aftermarket auto parts is less than $500 million per year without explaining the basis for his estimate.  Thus, Parts Geek has failed to offer any evidence of the relevant market and market share necessary to support its antitrust claims.

Parts Geek also argues that USAP's ownership of multiple domains is a barrier to entry because it is "more likely that when a consumer searches for auto parts on Google, a majority of the first page organic search results will be domains belonging to" USAP.  Opposition to USAP's Motion for Summary Judgment, p.12.  However, Parts Geek has failed to demonstrate that USAP operates more than a limited number of the websites involving the retail sale of auto parts; that USAP owns or has registered all or a significant number of the possible domain names relating to the retail sale of auto parts; that the number of websites available is limited; or that anyone has ever been precluded from entering the retail auto parts market because of an inability to obtain a website.  Therefore, Parts Geek are unable to demonstrate a significant barrier to entry.  *Los*

Initials of Deputy Clerk __sr__

*Angeles Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1428 n. 4 (9th Cir. 1993) (holding that the following are types of potential barriers to entry: (1) legal license requirements; (2) control of an essential or superior resource; (3) entrenched buyer preferences for established brands; (4) capital market evaluations imposing higher capital costs on new entrants; and (5) in some circumstances, economies of scale). Accordingly, USAP's Motion for Summary Judgment is **GRANTED** with respect to Parts Geek's first counterclaim pursuant to Section 2 of the Sherman Act for attempted monopolization, Parts Geek's second counterclaim pursuant to Section 2 of the Sherman Act for predatory pricing, and Parts Geek's third counterclaim for price discrimination under the Robinson-Patman Act.

> **2.   Parts Geek's Counterclaim for Tortious Interference with Economic Relationship.**

To demonstrate a claim for intentional interference with prospective economic advantage under California law, Parts Geek must demonstrate: (1) an economic relationship between Parts Geek and World Pac, with the probability of future economic benefit to Parts Geek; (2) USAP's knowledge of the relationship; (3) intentional acts by USAP designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to Parts Geek caused by the acts of USAP. *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153 (2003). In addition, Parts Geek must prove, among other things, that USAP "engaged in an independently wrongful act, *i.e.*, an act that is wrongful by some measure beyond the fact of the interference itself." *E & E Co., Ltd. v. Kam Hing Enters.*, 2008 WL 4962991, * 3 (N.D. Cal. Nov. 19, 2008) (internal quotation and citations omitted). "[A]n act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." *Korea Supply*, 29 Cal. 4th at 1159. Under this applicable standard, "[a]n act is not independently wrongful merely because defendant acted with improper motive." *Id.* at 1158. In other words, "a defendant's motive or purpose is relevant only to the extent that it renders the defendant's conduct unlawful." *Id.* at 1161.

In its Counterclaim, Parts Geek alleges that USAP interfered with its relationship with World Pac by: (1) "communicating with World Pac stating its intent to drive Parts Geek out of business;" (2) "directly request[ing] that World Pac cease selling parts to Parts Geek;" and (3) "through its efforts to embroil World Pac in this litigation . . . attempting to destroy the business relationship between Parts Geek and" World Pac. Counterclaims, ¶¶ 46-47.

In addition, in its Opposition to USAP's Motion for Summary Judgment, Parts Geek argues that USAP interfered with its relationship with World Pac by: (1) "disparaging" Parts Geek by "restating [to World Pac] the claims made against Parts Geek in the lawsuit;" and (2) "serv[ing] a baseless subpoena on World Pac . . . for the purpose of poisoning the relationship between World Pac and Parts Geek by publicizing to World Pac the claims USAP has asserted against Parts Geek." Opposition to USAP's Motion for Summary Judgment, pp. 19-20.

In this case, even if true, these acts are insufficient to support Parts Geek's claim for tortious interference with prospective economic advantage because they do not constitute an independent unlawful act. *See, e.g., A-Mark Coin Co. v. General Mills, Inc.*, 148 Cal. App. 3d 312, 324 (1984) (holding that "a defendant seeking to increase his own business may . . . refuse to deal with third parties unless they cease dealing with the plaintiff" and affirming the lower court's rejection of claim for intentional interference with prospective economic advantage); *Alexx, Inc. v. Kimcarter.com,*

*LLC*, 2009 WL 1068961, *2 (N.D. Cal. Apr. 21, 2009) ("allegation that . . . Alexx 'threatened and coerced potential customers and suppliers of Kimcarter to not do business with Kimcarter or suffer the same fate' does not suffice to allege that Alexx engaged in an 'independent wrongful act,' as required to state a claim for intentional interference" under California law).

Moreover, under California Civil Code § 47(b), communications related to judicial proceedings are absolutely immune from tort liability.  This litigation privilege applies to any communications: (1) made in a judicial proceeding, even if made outside the courtroom without the involvement of the court or its officers; (2) by litigants or other participants authorized by law; (3) to achieve the objects of litigation; and (4) that have some connection or logical relation to the action.  *Silberg v. Anderson*, 50 Cal. 3d 205, 213-16 (1990).  Therefore, even if these statements were made, the litigation privilege would immunize USAP from tort liability for claims arising from these communications.  *See, e.g., Sharper Image Corp. v. Target Corp.*, 425 F.Supp. 2d 1056, 1078-79 (N.D. Cal. 2006) (holding that the litigation privilege operated as an absolute bar to a tortious interference counterclaim arising from the plaintiff's communications with a third party mutual customer describing the plaintiff's allegations against the defendant); *Foothill Fed. Credit Union v. Sup. Ct.*, 155 Cal. App. 4th 632, 635-36 (2007) (holding that communications pursuant to third-party subpoena are protected by the litigation privilege).  Accordingly, USAP's Motion for Summary Judgment is **GRANTED** with respect to Parts Geek's fourth counterclaim for relief for intentional interference with prospective economic advantage.

## D.     The Parts Geek Defendants' Motion to Amend.

In their Motion to Amend, the Parts Geek Defendants seek leave to file a First Amended Answer and Counterclaim, to assert: (1) a claim for declaratory relief that the copyrights registered by USAP covering the Manager program are invalid and unenforceable; (2) a claim for copyright infringement against USAP for infringing the copyrights on the Manager program, which were assigned to Parts Geek on March 5, 2010; and (3) two related affirmative defenses.

Federal Rule of Civil Procedure 15(a) provides that "[t]he court should freely give leave [to amend] when justice so requires."  Fed. R. Civ. P. 15(a).  However, "[o]nce the district court has issued a pretrial scheduling order establishing a timetable for pretrial motions, Rule 16, not Rule 15, controls the amendment of pleadings."  *Hannon v. Chater*, 887 F. Supp. 1303, 1319 (N.D. Cal. 1995).  Federal Rule of Civil Procedure 16(b) provides that "[a] schedule may be modified only for good cause and with the judge's consent."  Fed. R. Civ. P. 16(b)(4).  "Unlike Rule 15(a)'s liberal amendment policy which focuses on the bad faith of the party seeking to interpose an amendment and the prejudice to the opposing party, Rule 16(b)'s 'good cause' standard primarily considers the diligence of the party seeking the amendment."  *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992); *see also Eckert Cold Storage, Inc. v. Behl*, 943 F. Supp. 1230, 1233 (E.D. Cal. 1996) (holding that "the focus of the Rule 16 'good cause' inquiry is on the moving party's diligence, or lack thereof, in seeking amendment").  As the Ninth Circuit explained:

> The district court may modify the pretrial schedule if it cannot reasonably be met despite the diligence of the party seeking the extension. Moreover, carelessness is not compatible with a finding of diligence and offers no reason for a grant of relief.  Although the existence or degree of prejudice to the party opposing the modification might supply additional reasons to deny a motion, the focus on the inquiry is upon the moving

Initials of Deputy Clerk _sr_

party's reasons for seeking modification.  If that party was not diligent, the inquiry should end.

*Johnson*, 975 F.2d at 609 (citations and quotations omitted); *see also Zivkovic v. Southern California Edison Co.*, 302 F.3d 1080, 1087 (9th Cir. 2002) ("If the party seeking the modification 'was not diligent, the inquiry should end' and the motion to modify should not be granted.").  "As Rule 16 recognizes, scheduling orders are at the heart of case management, and are intended to alleviate case management problems" and "good-faith compliance with Rule 16 plays an important role in this process."  *Jackson v. Laureate, Inc.*, 186 F.R.D. 605, 607 (E.D. Cal. 1999) (citations and quotations omitted).  Accordingly, to demonstrate diligence, the moving party is required to show: (1) that it was diligent in assisting the Court in creating a workable Rule 16 scheduling order; (2) that its noncompliance with the scheduling order's deadline occurred or will occur notwithstanding diligent efforts to comply because of "the development of matters which could not have been reasonably foreseen or anticipated at the time of the Rule 16 scheduling conference;" and (3) that it was diligent in seeking amendment of the scheduling order once it became apparent it could not comply with the order.  *Id.* at 608.  Finally, the Ninth Circuit has stated that "carelessness is not compatible with a finding of diligence and offers no reason for a grant of relief."  *Johnson*, 975 F.2d at 609.

On September 10, 2009, the Court issued a Scheduling and Case Management Order ("CMO") in this case.[20]  Pursuant to the CMO, the "deadline for joining parties and amending pleadings is ninety days after the date of the Scheduling Conference.  Any motions to join other parties or for leave to amend the pleadings shall be filed within sixty days of the date of the Scheduling Conference so that they can be heard and decided prior to the deadline."  CMO at 7:6-11.  Accordingly, the Parts Geek Defendants had until November 9, 2009, to file a motion to amend the pleadings, with a final deadline for amending the pleadings of December 9, 2009.  *See, id.*  The Parts Geek Defendants did not file their Motion until March 29, 2010, and, "[t]hus, consideration of plaintiff's ability to amend the complaint is governed by Rule 16(b), not Rule 15(a)."  *Eckert*, 943 F. Supp. at 1232.

The Parts Geek Defendants have failed to demonstrate good cause that would justify a modification of the deadlines set forth in the Court's September 10, 2009 CMO.  The Parts Geek Defendants admit in their Motion to Amend that they always had the information necessary to allege the counterclaims and affirmative defenses they now seek to add: "Parts Geek at all times believed that USAP's copyright and trade secret claims were unfounded for the simple reason that the copyrights covering the Manager software code were held by Lucas Thomason, and were never assigned to USAP."  However, the Parts Geek Defendants did not notice their motion for hearing until April 26, 2010 – a mere two months before the start of trial on June 29, 2010.

The Parts Geek Defendants argue that they could not seek to add these counterclaims and affirmative defenses until after Thomason assigned all his rights in Manger to Parts Geek on March

---

[20]  The Court concluded that the September 21, 2009 Scheduling Conference was unnecessary and it was taken off calendar by the Court.  The Court also issued an Amended Scheduling and Case Management Order ("Amended CMO") on March 23, 2010, but it was issued well after the deadline for requesting leave to amend the pleadings had passed, and, thus, did not re-open the period for requesting leave to amend.

Initials of Deputy Clerk __sr__

5, 2010.  However, the negotiations for the assignment of Thomason's rights in the Manager program, including the speed with which those negotiations took place, were largely in the control of the Parts Geek Defendants.  The Parts Geek Defendants have failed to demonstrate why their delay in obtaining the assignment of these rights constitutes good cause for allowing them to amend their answer and counterclaim this late in this action and potentially causing a delay in the fast-approaching trial date.

Accordingly, because the Parts Geek Defendants have failed to demonstrate good cause for modifying the CMO, the Parts Geek Defendants' Motion to Amend is **DENIED**.

## IV.    Conclusion

Thomason's Motion for Summary Judgment is **GRANTED** with respect to USAP's first claim for relief for misappropriation of trade secrets, USAP's third claim for relief for unfair competition under California Business & Professions Code § 17200, *et seq.,* and USAP's fourth claim for relief for copyright infringement.

The Parts Geek Defendants' Motion for Summary Judgment is **GRANTED** with respect to USAP's first claim for relief for misappropriation of trade secrets, USAP's second claim for relief for breach of contract, USAP's third claim for relief for unfair competition under California Business & Professions Code § 17200, *et seq.,* and USAP's fourth claim for relief for copyright infringement related to the Manager program.  The Parts Geek Defendants' Motion for Summary Judgment is **DENIED** with respect to USAP's fourth claim for relief for copyright infringement related to USAP's photograph of auto parts.

USAP's Motion for Summary Judgment is **GRANTED** with respect to Parts Geek's first counterclaim pursuant to Section 2 of the Sherman Act for attempted monopolization, Parts Geek's second counterclaim pursuant to Section 2 of the Sherman Act for predatory pricing, Parts Geek's third counterclaim for price discrimination under the Robinson-Patman Act, and Parts Geek's fourth counterclaim for relief for intentional interference with prospective economic advantage.

The Parts Geek Defendants' Motion to Amend is **DENIED**.

IT IS SO ORDERED.

Initials of Deputy Clerk __sr__