UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

SEP 25 2012

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| U.S. AUTO PARTS NETWORK, INC., <br><br> Plaintiff - Appellant, <br><br> v. <br><br> PARTS GEEK, LLC, a New Jersey limited liability company; et al., <br><br> Defendants - Appellees. | No. 10-56129 <br><br> D.C. No. 2:09-cv-04609-JFW-RZ <br> U.S. District Court for Central California, Los Angeles <br><br> **MANDATE** |

RECEIVED
CLERK, U.S. DISTRICT COURT

SEP 2 5 2012

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

| | |
|---|---|
| U.S. AUTO PARTS NETWORK, INC., <br><br> Plaintiff - Appellee, <br><br> v. <br><br> PARTS GEEK, LLC, a New Jersey limited liability company; et al., <br><br> Defendants - Appellants. | No. 10-56194 <br><br> D.C. No. 2:09-cv-04609-JFW-RZ <br> U.S. District Court for Central California, Los Angeles |

The judgment of this Court, entered August 31, 2012, takes effect this date.

This constitutes the formal mandate of this Court issued pursuant to Rule

41(a) of the Federal Rules of Appellate Procedure.

FOR THE COURT:
Molly C. Dwyer
Clerk of Court

Synitha Walker
Deputy Clerk

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

U.S. AUTO PARTS NETWORK, INC.,
*Plaintiff-Appellant,*

v.

PARTS GEEK, LLC, a New Jersey
limited liability company; RICHARD
E. PINE; BRIAN TINARI, an
individual; LOWELL E. MANN, an
individual; DANNIE HENDERSHOT,
an individual; LUCAS THOMASON, an
individual,
            *Defendants-Appellees.*

No. 10-56129

D.C. No.
2:09-cv-04609-
JFW-RZ

---

U.S. AUTO PARTS NETWORK, INC.,
*Plaintiff-Appellee,*

v.

PARTS GEEK, LLC, a New Jersey
limited liability company; RICHARD
E. PINE; BRIAN TINARI, an
individual; LOWELL E. MANN, an
individual; DANNIE HENDERSHOT, an
individual; LUCAS THOMASON, an
individual,
            *Defendants-Appellants.*

No. 10-56194

D.C. No.
2:09-cv-04609-
JFW-RZ

OPINION

Appeal from the United States District Court
for the Central District of California
John F. Walter, District Judge, Presiding

Argued and Submitted
March 6, 2012—Pasadena, California

10395

Filed August 31, 2012

Before: Jerome Farris, Richard R. Clifton, and
Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Ikuta

## COUNSEL

Gerald E. Hawxhurst (argued), Crowe Hawxhurst LLP, Los Angeles, California; Michael H. Simon, Christopher L. Garrett, Nathan R. Christensen, Perkins Coie LLP, Portland, Oregon, for appellant/cross-appellee U.S. Auto Parts Network, Inc.

Steven E. Angstreich (argued), Weir and Partners LLP, Cherry Hill, New Jersey; Daniel E. Sobelsohn, The Sobelsohn Law Firm, Los Angeles, California, for appellee/cross-appellant Parts Geek LLC.

Wendy S. Albers (argued), Reed Smith LLP, Los Angeles, California, for appellee Lucas Thomason.

## OPINION

IKUTA, Circuit Judge:

U.S. Auto Parts Network (USAP) brought suit against Parts Geek, LLC and various individuals alleging, among other things, copyright infringement in certain e-commerce soft-

ware. The district court granted summary judgment against USAP on its claim of copyright infringement because it concluded that USAP did not own the allegedly infringed copyright. Because there are genuine issues of material fact as to whether USAP owns a copyright in all or part of the software at issue, we reverse in part, vacate in part, and remand.[1]

I

The story starts in 1996, when Richard Pine and Todd Daugherty founded BenzBin, a website that sold Mercedes-Benz car parts. By 2000, Pine and Daugherty met two more internet entrepreneurs, Brian Tinari and Lowell Mann. Together they began to work on what had by then become Partsbin, a website selling replacement parts for cars of all makes. Partsbin needed software to help it process customer orders over the internet (e-commerce software) and so Tinari entered into discussions with a computer programmer, Lucas Thomason, to license an order processing program of Thomason's called Manager 2000.[2] Thomason wrote the program in "late 1999 or early 2000," while he was "self-employed and doing business as 'Lucas Networks.'" Thomason gave Partsbin a "perpetual license to use" Manager 2000 and Partsbin began using the software in its business.

Sometime around April 2001, after Thomason provided the company with the Manager software, Partsbin hired him as its "director of eServices." As part of the position, Thomason moved into one of Pine's houses that doubled as a Partsbin office. While at Partsbin, Thomason worked on, among other things, "creating websites, catalogs and maintaining the network." He also continued to make "modifications and

---

[1] In this opinion, we address only USAP's claim of copyright infringement. In a memorandum disposition filed concurrently with this opinion, we address the balance of the district court's summary judgment order.

[2] The parties use numerous names for this software, but this opinion will use Manager 2000 to avoid confusion.

enhancements" to Manager 2000, some at the direction of his supervisors, and some of his own accord because he thought it "might be helpful or needed" given Partsbin's changing needs. For example, Partsbin began as both a retailer and direct distributor of the parts it sold online; it carried stock, sold, and delivered whatever parts customers ordered. But this integrated business model meant that the size of its online catalog was limited by the size of its warehouse. Partsbin's business entered a new phase after its primary supplier agreed to ship parts directly to Partsbin customers without having Partsbin keep the parts in stock. Use of this drop shipping technique expanded Partsbin's business to the extent that Tinari, one of the Partsbin founders, called it a "material breakthrough."

Thomason tailored the Manager software to fit Partsbin's business changes. He added one of these modifications, called Auto Vend, around "2003 to early 2004." Auto Vend is a distributor selection system: if a customer orders a part that is out of stock in Partsbin's own warehouse, Auto Vend will identify an appropriate distributor to fill the customer's order.

As Partsbin evolved, so did Manager 2000. In his time working at Partsbin, Thomason developed at least four more versions of Manager—Manager 2001, Manager 2001 v2, Manager 2003, and Manager 2005.[3] There is no record of a written agreement between Thomason and Partsbin regarding the ownership rights to Thomason's "modifications and enhancements" to Manager 2000.

Partsbin became an internet success story. By 2006, its annual sales had reached approximately $80 million. Partsbin's success attracted suitors, one of which was USAP, another online retailer of aftermarket auto parts. In May 2006,

---

[3]Thomason was employed at Partsbin from April 2001 to May 2006 with a possible gap from "the end of 2001" to "possibly midsummer of 2002."

USAP and Partsbin entered into an acquisition agreement, whereby USAP agreed to purchase Partsbin for some $50 million. The acquisition agreement listed Partsbin's assets as including all its "Intellectual Property," defined in relevant part as "all rights to and interests in . . . all Software, copyrights . . . registrations and applications thereof . . . ." "Software" was defined, in turn, to mean "title and interest in the [Partsbin] software programs" identified in a schedule attached to the agreement. The attached schedule of intellectual property rights stated in relevant part:

| e-commerce system | — owned by Company [Partsbin] |
| manager | — owned by Company [Partsbin] |

After the acquisition, USAP hired many of Partsbin's key employees, including the four founders (Pine, Daugherty, Tinari, and Mann), Thomason, and Pine's son-in-law, Dannie Hendershot, who was also an early-stage Partsbin employee. According to Thomason, his "primary role" at USAP was to "manage Manager" by again making "modifications and enhancements" to the software in order to accommodate the needs of his co-workers and supervisors. Eventually, these updates led to the development of at least two more versions of e-commerce software, Manager July 2008, and Versapart.

Thomason resigned from USAP in July 2008. Around that same time, Pine, Tinari, Mann, and Hendershot also left USAP to launch a new online aftermarket car parts retailer named Parts Geek. Parts Geek needed e-commerce software, so it contacted Thomason. Thomason began work on the Parts Geek project about four weeks before he left USAP. He finished writing the new software, called Admin, by October 2008 and Parts Geek began accepting orders through Admin shortly thereafter.

Parts Geek was another success, growing to over $12 million in sales by the end of 2009. This rapid growth attracted

USAP's attention and suspicion, culminating in this suit by USAP against Parts Geek and Thomason claiming, among other things, that Admin infringes USAP's copyrights in Manager. USAP also brought three state law causes of action (misappropriation of trade secrets, breach of contract, and unfair competition), and Parts Geek responded with federal antitrust and state tortious interference counterclaims.

Parts Geek and Thomason moved for summary judgment on USAP's claims, and USAP did the same on Parts Geek's counterclaims. As part of its opposition to summary judgment, USAP submitted the first report of its software expert, which stated that Admin included a feature "substantially similar" to Auto Vend in Manager. In addition, USAP requested a continuance of the summary judgment proceedings until (1) it could depose Thomason and, (2) its software expert could prepare a second report comparing the first four versions of Manager (2000, 2001, 2001 v2, and 2003) to the later versions of the software (Versapart and Admin). The district court denied the continuance for USAP's software expert's second report, but allowed the continuance as to Thomason's deposition. Both parties filed supplemental summary judgment briefing following the deposition.

The district court granted summary judgment to Parts Geek and Thomason on USAP's copyright infringement claim for Manager, concluding that USAP did not own the copyright to any versions of Manager because "Thomason never agreed to transfer his ownership of the Manager program (or any of its subsequent versions) to either Partsbin or USAP." Because the district court concluded that USAP had no ownership interest in Manager, it ruled that USAP had no standing to bring suit for infringement. Following summary judgment, Parts Geek and Thomason moved for attorneys' fees for USAP's claims related to the Manager software. The district court granted the motions and awarded fees. The parties timely appealed.

On appeal, USAP claims that the district court erred in granting summary judgment in favor of Parts Geek and Thomason because USAP does have an ownership interest in those portions of Manager that Thomason prepared while he was working at Partsbin. According to USAP, Thomason's work while employed at Partsbin was "work made for hire," 17 U.S.C. § 101, and therefore Partsbin was the copyright owner of (at a minimum) any copyrightable enhancements Thomason added to Manager 2000 while working for Partsbin, *id.* at § 201(b). USAP asserts that it became the copyright owner of these enhancements when it acquired Partsbin's intellectual property. By the same work for hire theory, USAP also claims the copyright to the enhancements Thomason added to Manager while he was employed at USAP. Finally, USAP asserts that Parts Geek and Thomason infringed USAP's copyright to these enhancements by using substantially similar features as part of Admin.

We have jurisdiction pursuant to 28 U.S.C. § 1291 and review de novo a district court's grant of summary judgment, as well as its interpretation of the Copyright Act. *Ellison v. Robertson*, 357 F.3d 1072, 1075-76 (9th Cir. 2004). As the moving parties, Parts Geek and Thomason bear the burden of proving the absence of a genuine issue of material fact. *Id.* A genuine issue of material fact exists if there is evidence from which a jury could reasonably render a verdict in favor of USAP, the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). In determining whether a jury could so find, we draw all reasonable inferences in favor of USAP. *Ellison*, 357 F.3d at 1075.

II

We must first determine whether USAP's theory of copyright ownership is based on a correct legal interpretation. The key to USAP's argument is the interaction of two provisions in the Copyright Act: the provision making employers the copyright owner of an employee's "work made for hire," 17

U.S.C. § 201(b), and the provision governing copyright ownership of "derivative works," *id.* at § 103. We consider each in turn.

A

**[1]** We begin by considering the applicability of the "work made for hire" doctrine to Thomason's development of software enhancements to Manager 2000 while employed at Partsbin and USAP. Software source code is subject to copyright protection. *JustMed, Inc. v. Byce*, 600 F.3d 1118, 1125 n.3 (9th Cir. 2010). Under § 201(a)[4] of the Copyright Act, copyright ownership "vests initially in the author or authors of the work," which is generally the creator of the copyrighted work. *See Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (1989). "The Act carves out an important exception, however, for 'works made for hire.' " *Id.* at 737. If a work is made for hire, "the employer or other person for whom the work was prepared is considered the author" and owns the copyright "unless the parties have expressly agreed otherwise in a written instrument signed by them." § 201(b)[5]; *see also Thomson v. Larson*, 147 F.3d 195, 205 n.27 (2d Cir. 1998) ("The work-for-hire provisions are an exception to the rule that copyrights belong in the first instance only to creators."). Relevant here, a "work made for hire" is defined as "a work prepared [1] by an employee [2] within the scope of his or her employment." § 101.

[4]Section 201(a) provides:

Initial Ownership.— Copyright in a work protected under this title vests initially in the author or authors of the work. The authors of a joint work are coowners of copyright in the work.

[5]Section 201(b) provides:

Works Made for Hire.— In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright.

**[2]** Although the Copyright Act does not define either "employee" or "scope of employment," these terms must be "understood in light of the general common law of agency." *Reid*, 490 U.S. at 739-41 (applying agency principles to conclude that an artist who had been commissioned by a nonprofit corporation to create a sculpture was not an "employee" who had created the work within the "scope of his employment."). *Reid* cited to section 228 of the Restatement (Second) of Agency as a source of these common law principles, *id.* at 740, and courts have accordingly adopted section 228's three-prong test for determining when a work is made by an employee "within the scope" of employment: "(a) it is of the kind [the employee] is employed to perform; (b) it occurs substantially within the authorized time and space limits; [and] (c) it is actuated, at least in part, by a purpose to serve the [employer]." *Avtec Sys., Inc. v. Peiffer*, 21 F.3d 568, 571 (4th Cir. 1994) (quoting Restatement § 228); *accord Shaul v. Cherry Valley-Springfield Cent. Sch. Dist.*, 363 F.3d 177, 186 (2d Cir. 2004) (same); *see also* 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 5.03[B][1][b][I] (2011).

**[3]** We join our sister circuits in adopting this approach. Provided that Partsbin and USAP had the right to create derivative work based on Manager 2000, any separately copyrightable software source code developed by Thomason while at Partsbin, and later USAP, is a "work made for hire" if (1) Thomason was an employee of Partsbin and USAP, and (2) the development of software code was the type of work he was employed to perform, the work occurred substantially within the authorized work hours and space limits, and the work was actuated, at least in part, by a purpose to serve Partsbin and USAP.

B

We next consider how and when enhancements to software programs such as Manager 2000 can be separately copyright-

able as derivative works. A "work based upon one or more
preexisting works" that "recast[s], transform[s], or adapt[s]"
the preexisting work is referred to as a "derivative work." 17
U.S.C. § 101.[6] A copyright owner has the exclusive right to
"prepare" and authorize the preparation of "derivative works
based upon the copyrighted work." *Id.* at § 106(2). A nonex-
clusive license of this right "may be granted orally, or may
even be implied by conduct." *Effects Assocs. v. Cohen*, 908
F.2d 555, 558 (9th Cir. 1990) (quoting *Nimmer on Copyright*
§ 10.03[A] (1989)).

[4] The resulting derivative work may be independently
copyrightable, but the scope of this copyright is limited. For
example, where the copyright owner has authorized a third
party to prepare a derivative work based on the owner's pre-
existing work, copyright protection in the derivative work
will cover only "the material contributed by the author of such
work, as distinguished from the preexisting material
employed in the work." § 103(b); *see Stewart v. Abend*, 495
U.S. 207, 223 (1990) ("The aspects of a derivative work
added by the derivative author are that author's property, but
the element drawn from the pre-existing work remains on
grant from the owner of the pre-existing work."); *Russell v.
Price*, 612 F.2d 1123, 1128 (9th Cir. 1979). Copyright in this
contributed material "is independent of, and does not affect or
enlarge the scope, duration, ownership, or subsistence of, any
copyright protection in the preexisting material." § 103(b).
However, copyright protection for a derivative work "does
not extend to any part of the work in which such [preexisting]

---

[6]Section 101 defines a "derivative work" as:

a work based upon one or more preexisting works, such as a
translation, musical arrangement, dramatization, fictionalization,
motion picture version, sound recording, art reproduction, abridg-
ment, condensation, or any other form in which a work may be
recast, transformed, or adapted. A work consisting of editorial
revisions, annotations, elaborations, or other modifications
which, as a whole, represent an original work of authorship, is a
"derivative work."

material has been used unlawfully." § 103(a). Thus, if a third party uses preexisting work in violation of the Copyright Act, *see Ets-Hokin v. Skyy Spirits, Inc.*, 225 F.3d 1068, 1078 n.7 (9th Cir. 2000), the resulting derivative work is not entitled to copyright protection. In short, § 103 provides that a derivative author may own the copyright in material the author contributed to a preexisting work, but not in infringing material or material the author did not create.

We have adopted the Second Circuit's test for ascertaining whether a derivative work meets copyright law's fundamental requirement of originality. In order to be copyrightable, (1) "the original aspects of a derivative work must be more than trivial" and (2) "the original aspects of a derivative work must reflect the degree to which it relies on preexisting material and must not in any way affect the scope of any copyright protection in that preexisting material." *Entm't Research Grp. v. Genesis Creative Grp.*, 122 F.3d 1211, 1220 (9th Cir. 1997) (quoting *Durham Indus. v. Tomy Corp.*, 630 F.2d 905, 909 (2d Cir. 1980)). This *Durham* test establishes two ways of asking the same underlying question: whether the derivative work meets the "constitutional requirement" of originality enunciated in *Feist Publications, Inc. v. Rural Telephone Service Co.*, 499 U.S. 340, 346 (1991). In *Feist,* the Supreme Court held that "[t]o qualify for copyright protection, a work must be original to the author," meaning that "the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity." *Id.* at 345. Thus, the first prong of the *Durham* test asks whether the derivative work is original to the author and non-trivial, i.e., possesses the minimal degree of independent creativity required by *Feist. Durham*, 630 F.2d at 909; *Entm't Research Grp.*, 122 F.3d at 1220. The second prong asks whether the author of the derivative work made so few changes to the preexisting work that issuing a copyright for the derivative work would prevent the owner of the preexisting work from exercising some of its rights under copyright law. *Entm't Research Grp.*, 122 F.3d at 1220.

*Durham* illustrates how this test should be applied. In that case, a toy company that produced Mickey Mouse, Pluto, and Donald Duck toys claimed that it owned a derivative copyright in these Disney characters. *Durham*, 630 F.2d at 908-11. The court rejected this claim. First, the court held that the toys contained "no independent creation" and lacked "even a modest degree of originality." *Id.* at 910-11. Second, the court explained that if it recognized the toymaker's derivative copyright in the toys, then other licensees of Disney would "as a practical matter, have to make substantial changes in these characters in order to avoid infringing [the toymaker's derivative] rights." *Id.* at 911. As a result, "Disney's right to copy (or to permit others to copy) its own creations would, in effect, be circumscribed." *Id.* Because any material the toymaker contributed to the Disney characters was trivial and lacked the requisite originality, *Durham* concluded the toys were not copyrightable. *Id.* at 910-11; *see also Entm't Research Grp.*, 122 F.3d at 1220.

**[5]** Applying this test, we conclude that in order to be copyrightable derivative works, Thomason's contributions to Manager 2000 would have to be lawfully based on Manager 2000 and contain non-trivial enhancements that do not affect the scope of copyright protection in Manager 2000. *See Entm't Research Grp.*, 122 F.3d at 1220.

C

**[6]** Having separately examined the work for hire and derivative work provisions of the Copyright Act, we now must read them together. Based on our review, we conclude that absent a written agreement to the contrary, the employer is the author of a work made for hire. § 201(b). If such a work is lawfully derived from a preexisting copyrighted work, the employer holds the copyright to the original, non-trivial material contributed to the preexisting work. § 103. Therefore, we agree with USAP's interpretation of the law: if Thomason's contributions to Manager 2000 while he was an employee at

Partsbin and USAP were works made for hire and were also copyrightable derivative works, then Partsbin and USAP would be the copyright owners of those works.

### III

We next apply these legal principles to the facts of this case in order to determine whether there is a genuine issue of material fact that USAP owned copyrightable portions of the post-2000 versions of Manager.[7] Our analysis of the Copyright Act demonstrates that this question consists of two intertwined threshold issues: whether a jury could reasonably infer (1) that Thomason's enhancements to Manager 2000 constituted "work made for hire" as defined in the Copyright Act (and thus potentially owned by Partsbin and USAP), and (2) that such enhancements are copyrightable, meaning that Partsbin and USAP held non-exclusive licenses to modify Manager 2000 and these modifications are sufficiently original.

### A

We begin with the question whether a jury could reasonably infer that Thomason's work on the Manager software for Partsbin and USAP constituted "work made for hire." More specifically, we must determine whether a jury could reasonably conclude that (1) Thomason was an employee of Partsbin and then USAP when he created the later versions of Manager (2001, 2001 v2, 2003, 2005, July 2008, and Versapart) and (2) these works were made "within the scope of his employment." § 101.

As a threshold matter, it is undisputed that Thomason was a Partsbin employee from April 2001 to sometime in 2006, and after that, a USAP employee until July 2008.

---

[7]The parties do not dispute that Thomason is the author and copyright owner of Manager 2000.

We therefore turn to the question whether Thomason's updates to Manager were made within the scope of his employment, that is, whether such coding was the kind of work Partsbin and USAP employed Thomason to perform, occurred within authorized work hours and space limits, and was actuated, at least in part, by a purpose to serve Partsbin and USAP. *See Avtec*, 21 F.3d at 571. There is evidence in the record to support such an inference.

[7] First, a jury could reasonably find that Thomason's modifications to Manager 2000 were the kind of work Thomason was "employed to perform." *See id.* According to testimony in the record, Thomason was hired as an employee by Partsbin shortly after "he provided the company with the Manager software for it to use as its e-commerce system." At Partsbin, Thomason worked as the "director of eServices," where his job included "creating websites, catalogs and maintaining the network," and making "changes or modifications" to Manager. Thomason acknowledged that many of these modifications were made in response to requests by his Partsbin supervisors. Similarly, Thomason testified that his "primary role" at USAP was to "manage Manager" by making "modifications and enhancements" to the software that were, at least in part, requested by the company.

[8] As to the second prong, whether Thomason wrote the source code for these later versions of Manager 2000 "substantially within authorized time and space limits," *id.*, there is little evidence in the record either way. But this lack of evidence is not dispositive. Rather, as *Avtec* noted, when there is evidence that the employee's creation was the "kind of work" the employee was employed to perform, courts have tended to put little weight on evidence that "the work was done at home on off-hours." *Id.* at 571-72 (citing cases); *cf. JustMed*, 600 F.3d at 1128 (recognizing that for the purposes of a work for hire situation, courts must be sensitive to the fact that a "small start-up company" might "conduct[ ] its business more informally than an established enterprise might"). In any

event, here, the small amount of record evidence on this issue supports USAP's position. Because Thomason testified that he lived rent-free in a house that doubled as a Partsbin office while working on Partsbin's software, a jury could reasonably infer that neither Thomason nor Partsbin strictly differentiated between work and home, or between work hours and off hours, and thus all of Thomason's work on Manager was within authorized work hours and space limits. *See Shaul*, 363 F.3d at 186.

**[9]** Finally, a reasonable jury could infer from the record that Thomason's creation of these updated Manager programs was "actuated, at least in part, by a purpose to serve" Partsbin and USAP by making the software better suited to their businesses. *See id.* For example, Thomason explained that some of the "modifications or enhancements" he made to Manager while at Partsbin were ones that he determined to be "helpful or needed" to the company as determined by his own research. He testified similarly regarding his work at USAP.

**[10]** In light of this analysis, we conclude that there is a genuine issue of material fact as to whether Thomason's work on Manager while at Partsbin and USAP constitutes work made for hire. Because there is no evidence that Thomason and his employers "expressly agreed" in a "written instrument signed by them" that Thomason would be the author of any work he contributed to Manager during his employment,[8] § 201(b), a jury could reasonably infer that Partsbin and USAP became the owners of any such work made for hire, and that when USAP acquired Partsbin, it also acquired the work Thomason did on Manager while employed at Partsbin.

Parts Geek and Thomason argue that USAP waived its argument that it owned Thomason's modifications to Man-

---

[8]The current dispute is largely the result of the parties' failures to express or document clearly the precise terms of their relevant understandings.

ager by failing to raise it to the district court. But USAP sufficiently raised this argument in its supplemental brief in opposition to summary judgment following Thomason's deposition, which the district court permitted the parties to file. In that brief, USAP argued that Thomason "made changes, modifications, and enhancements to the Manager software" while employed by Partsbin, and later, by USAP, and as a result, "all of the work that Thomason did on the Manager software as an employee belongs to his employers." This argument was "raised sufficiently for the trial court to rule on it" and was therefore not waived. *O'Rourke v. Seaboard Sur. Co. (In re E.R. Fegert, Inc.)*, 887 F.2d 955, 957 (9th Cir. 1989).

B

This conclusion leads to the next question, whether any of Thomason's work on Manager while employed by Partsbin and USAP was copyrightable under the rules applicable to derivative works.[9] To answer this question, a fact finder must determine (1) whether Partsbin and USAP lawfully derived the enhancements to Manager 2000 that led to the subsequent versions of the software, and (2) whether any of these enhancements were "more than trivial" such that they did not affect the scope of the copyright in Manager. *Entm't Research Grp.*, 122 F.3d at 1220; *Durham*, 630 F.2d at 909; § 103(b).

[11] First, Thomason and Parts Geek argue that Thomason's enhancements to Manager 2000 are not copyrightable derivative works because they were made through an unlawful use of Manager 2000, the preexisting work. Specifically,

_____

[9]USAP argues that the later versions of Manager produced by Thomason while at Partsbin and USAP are not derivative works, but are in fact entirely new works owned by Partsbin, and now USAP. Because the district court denied USAP's request to introduce evidence on this point, the record is undeveloped on the issue. Therefore, for purposes of this appeal, we assume without deciding that Thomason created derivative works based on Manager 2000 while he was at Partsbin and USAP.

Parts Geek asserts that Partsbin infringed Thomason's exclusive right to create and authorize the creation of derivative works based on Manager 2000. § 106(2). We disagree. A reasonable jury could infer that Thomason provided Partsbin and USAP with an implied non-exclusive license to prepare derivative works from his software. *See Effects Assocs.*, 908 F.2d at 558; *see also Asset Mktg. Servs. v. Gagnon*, 542 F.3d 748, 755-57 (9th Cir. 2008). While employed by both Partsbin and USAP, Thomason willingly modified and enhanced Manager 2000 and later versions of the software in response to his employer's requests. Thus, a genuine issue of material fact exists as to whether Thomason's conduct created an implied license to Partsbin, USAP, or both, to use Manager 2000 (or other versions of Manager for which Thomason potentially retained copyright ownership) in developing the subsequent versions of Manager.

[12] Second, although the record is relatively undeveloped on this issue, a reasonable jury could infer that Thomason added at least one original and non-trivial feature to Manager 2000 while working at Partsbin: Auto Vend, Manager's distributor selection system that Thomason created in "2003 to early 2004." The record shows that Auto Vend was integral to how Manager facilitated drop shipping because it allowed Partsbin to satisfy its customers' orders from the appropriate parts suppliers. Given that a Partsbin founder described the company's switch to using drop shipping as a "material breakthrough," it is reasonable to infer that Thomason needed to develop entirely new source code for the software feature facilitating this "breakthrough." *See Entm't Research Grp.*, 122 F.3d at 1220; *see also Feist*, 499 U.S. at 345 ("To be sure, the requisite level of creativity is extremely low; even a slight amount will suffice.").

[13] Moreover, a jury could reasonably conclude that the copyright to the Auto Vend feature is "independent of, and does not affect or enlarge the scope" of Thomason's preexisting copyright in Manager 2000. § 103(b). The record shows

that Partsbin used Manager 2000 for two or three years before Auto Vend was added, which provides evidence that Auto Vend added an independent functionality to the preexisting Manager 2000. Thus, it is reasonable to infer that Thomason would be free to copy and license Manager 2000 (without Auto Vend) to others, and that such licensees would not have to be concerned about vulnerability to suit from Partsbin for infringement of the Auto Vend feature. *Cf. Entm't Research Grp.*, 122 F.3d at 1220; *Durham*, 630 F.2d at 909. Because Partsbin's ownership of the copyright to Auto Vend would not circumscribe Thomason's right to copy or license Manager 2000, a jury could reasonably conclude that Auto Vend was a copyrightable element of Thomason's work made for hire. *See Entm't Research Grp.*, 122 F.3d at 1220.

[14] Accordingly, a jury could reasonably conclude that Partsbin owned the copyright to Auto Vend because it was a non-trivial, original feature contributed to a lawfully used preexisting work, Manager 2000, as a work made for hire. A jury could also conclude that USAP acquired this copyright when it acquired Partsbin's "Intellectual Property," including "title and interest in [Partsbin's] software programs," in 2006.

## IV

[15] Although our analysis of USAP's claims required a long trip through a previously unexplored intersection of the Copyright Act's work for hire and derivative work provisions, our conclusion is straightforward: there is a genuine issue of material fact as to whether USAP owns the copyright to all or any part of Manager. Based on our review of the law and the record, and drawing all inferences in favor of USAP, a jury could reasonably determine that even though Thomason owned the copyright to Manager 2000, (1) Thomason granted Partsbin and USAP implied, non-exclusive licenses to create derivative work from that software, (2) Thomason's modifications to that software while employed by Partsbin and USAP were made within the scope of his employment, (3) at least

one of those modifications made while employed by Partsbin, Auto Vend, was independently copyrightable as a work made for hire, and (4) such copyright was transferred to USAP in 2006 as part of its acquisition of Partsbin. Therefore, the district court erred in granting summary judgment on the ground that USAP could not show any such ownership interest as a matter of law. We reverse the district court's grant of summary judgment to Parts Geek on USAP's copyright infringement claim on this basis.

Because the district court granted summary judgment on this misunderstanding of USAP's ability to own a copyright to features of Manager, it did not reach the question whether Thomason's creation and Parts Geek's use of Admin infringed USAP's copyright in the portions of Manager to which USAP holds the copyright. On remand, the parties may develop the record regarding this issue of infringement as well as the threshold issues of copyright ownership, such as the scope of Thomason's work for hire while employed at Partsbin (including any agreements he may have had with Partsbin regarding his modifications to Manager 2000), the scope of Thomason's work for hire while employed at USAP, and the relationship between Manager 2000 and the post-2000 versions of Manager.[10] The district court should examine these issues in the first instance in light of this decision.

**REVERSED in part, VACATED in part, AND REMANDED.**

---

[10]USAP's appeal of the district court's denial of its motion for continuance of summary judgment pending further discovery is dismissed as moot. *See Noyes v. Kelly Servs.*, 488 F.3d 1163, 1174 (9th Cir. 2007). We also vacate the district court's entry of attorneys' fees as to USAP's copyright infringement claim. *See United States v. 4,432 Mastercases of Cigarettes, More or Less*, 448 F.3d 1168, 1194 (9th Cir. 2006).

**FILED**

**NOT FOR PUBLICATION**

AUG 31 2012

UNITED STATES COURT OF APPEALS

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

FOR THE NINTH CIRCUIT

---

| | |
|---|---|
| U.S. AUTO PARTS NETWORK, INC., | No. 10-56129 |
| Plaintiff - Appellant, | D.C. No. 2:09-cv-04609-JFW-RZ |
| v. | |
| PARTS GEEK, LLC, a New Jersey limited liability company; et al., | MEMORANDUM[*] |
| Defendants - Appellees. | |

| | |
|---|---|
| U.S. AUTO PARTS NETWORK, INC., | No. 10-56194 |
| Plaintiff - Appellee, | D.C. No. 2:09-cv-04609-JFW-RZ |
| v. | |
| PARTS GEEK, LLC, a New Jersey limited liability company; et al., | |
| Defendants - Appellants. | |

Appeal from the United States District Court
for the Central District of California
John F. Walter, District Judge, Presiding

---

[*]     This disposition is not appropriate for publication and is not precedent except as provided by 9th Cir. R. 36-3.

Argued and Submitted March 6, 2012
Pasadena, California

Before: FARRIS, CLIFTON, and IKUTA, Circuit Judges.

The district court erred in granting summary judgment to Parts Geek,

Thomason, Pine, Tinari, Hendershot, and Mann (collectively, the "Parts Geek

defendants") on U.S. Auto Parts' (USAP) claim for misappropriation of its trade

secrets in the Manager software because a jury could reasonably conclude that

USAP owned some rights to Manager. Moreover, in its supplemental response to

Thomason's Interrogatory No. 1, USAP identified the key functional components

of the Manager software that it claimed to be trade secrets, and thus "describe[d]

the subject matter of the trade secret with sufficient particularity." *IMAX Corp. v.*

*Cinema Techs., Inc.*, 152 F.3d 1161, 1164–65 (9th Cir. 1998) (quoting *Universal*

*Analytics v. MacNeal-Schwendler Corp.*, 707 F. Supp. 1170, 1177 (C.D. Cal.

1989)) (emphasis omitted). We likewise reject Parts Geek's argument that it

cannot be held liable for misappropriation of trade secrets because it had a license

to use Admin, given that USAP raised a genuine issue of material fact that Parts

Geek had "reason to know" that Thomason acquired the software code in Admin

by improper means. Cal. Civ. Code § 3426.1(b)(1). Further, a jury could

reasonably conclude that Manager derived "actual or potential" economic value

from not being generally known to the public. § 3426.1(d)(1). Because we reverse

the district court's grant of summary judgment on this claim, we also vacate its

corresponding award of attorney's fees to the Parts Geek defendants under Section

3426.4 of the California Civil Code. *See United States v. 4,432 Mastercases of*

*Cigarettes, More or Less*, 448 F.3d 1168, 1194 (9th Cir. 2006).

We affirm the district court's grant of summary judgment to the Parts Geek

defendants on USAP's claims for misappropriation of trade secrets related to its

keyword return-on-investment (ROI) data. Even assuming there was sufficient

evidence for a jury to reasonably find that Parts Geek used USAP's ROI data,

USAP failed to state a prima facie claim for trade secret misappropriation because

it did not adduce any evidence that this use damaged USAP. *See Sargent Fletcher,*

*Inc. v. Able Corp.*, 3 Cal. Rptr. 3d 279, 283 (Cal. Ct. App. 2003). Contrary to

USAP's assertion at oral argument, such a showing of harm is necessary for its

demand of injunctive relief as well. *See DVD Copy Control Ass'n v. Bunner*, 10

Cal. Rptr. 3d 185, 191–92 (Cal. Ct. App. 2004).

We reverse the district court's grant of summary judgment to Pine and

Tinari on USAP's breach of contract claim because Pine's and Tinari's release

agreements were susceptible to "two different reasonable interpretations" and were

therefore ambiguous. *Oceanside 84, Ltd. v. Fid. Fed. Bank*, 66 Cal. Rptr. 2d 487,

492 (Cal. Ct. App. 1997). An agreement that is "entered into . . . in connection

3

with the acquisition of Partsbin," may refer to any agreement that Pine and Tinari

signed with USAP as a result of USAP's acquisition of Partsbin, or it may refer to

the specific documents related to the acquisition itself, such as financing forms or

other shareholder agreements, that Pine and Tinari entered into with USAP.  Given

this ambiguity, and the lack of extrinsic evidence that resolves the issue, the intent

of the parties as to the meaning of this provision and whether it was breached must

be decided at trial.  *See Mattel, Inc. v. MGA Entm't, Inc.*, 616 F.3d 904, 913 (9th

Cir. 2010).

   We affirm the district court's grant of summary judgment to Hendershot on

USAP's breach of contract claim because USAP adduced no evidence from which

a reasonable factfinder could conclude that Hendershot had access to USAP's

confidential information.

   We affirm the district court's grant of summary judgment to USAP on Parts

Geek's antitrust counterclaims because Parts Geek offered insufficient evidence to

define the relevant market that USAP attempted to monopolize, *see Rebel Oil Co.

v. Atlantic Richfield Co.*, 51 F.3d 1421, 1434–35 (9th Cir. 1995), and failed to offer

evidence such that a jury could reasonably find that there were significant entry

barriers to that market, *see Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*,

924 F.2d 1484, 1490 (9th Cir. 1991).  Parts Geek's claims for predatory pricing fail

4

for the same reasons. *See W. Parcel Express v. UPS of Am., Inc.*, 190 F.3d 974,

975 (9th Cir. 1999).

The parties shall bear their own costs on appeal.[1]

**AFFIRMED in part, REVERSED in part, VACATED in part.**

---

[1] In a separate opinion filed concurrently with this memorandum disposition, we reverse the district court's grant of summary judgment on USAP's copyright infringement claim related to the Manager software and vacate the district court's award of attorneys' fees to Parts Geek on that claim.

5